UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60430-CIV-COHN/SELTZER

SPACE COAST CREDIT UNION,
as Successor-in-Interest to EASTERN
FINANCIAL FLORIDA CREDIT UNION,

    Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED; MERRILL
LYNCH CREDIT CORPORATION (d/b/a
MERRILL LYNCH HOME LOANS);
WELLS FARGO SECURITIES LLC
(f/k/a WACHOVIA CAPITAL MARKETS
LLC); J.P. MORGAN SECURITIES INC.
(f/k/a BEAR STEARNS & CO., INC.);
UBS SECURITIES LLC; BARCLAYS
CAPITAL INC.; RICHARD S. FULD, JR.;
MOODY'S INVESTORS SERVICE, INC.;
and THE MCGRAW HILL COMPANIES,
INC. (formerly d/b/a STANDARD &
POOR'S RATING SERVICES),

    Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

**THIS CAUSE** is before the Court upon several dismissal motions filed by Defendants: Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Securities LLC (f/k/a Wachovia Capital Markets LLC), J.P. Morgan Securities Inc. (f/k/a Bear Stearns & Co., Inc.), UBS Securities LLC, and Barclays Capital Inc.'s Joint Motion to Dismiss [DE 58]; Corrected Motion to Dismiss Claims Against Merrill Lynch, Pierce, Fenner & Smith Incorporated [DE 69]; Defendant Wells Fargo Securities LLC's Motion to Dismiss [DE 63]; Defendant J.P. Morgan Securities, LLC's Supplemental Motion to Dismiss [DE 65]; UBS Securities LLC's Motion to Dismiss Plaintiff's Complaint

Pursuant to Rules 12(b)(6) and 9(b) [DE 60]; Defendant Barclays Capital Inc.'s Supplemental Memorandum of Law in Support of Its Motion to Dismiss [DE 59]; Defendant Moody's Investors Service, Inc.'s Motion to Dismiss [DE 64]; and Defendant The McGraw-Hill Companies, Inc.'s Motion to Dismiss the Complaint [DE 57] (together, "Motions"). The Court has carefully reviewed the Motions and all related filings and is otherwise fully advised in the premises.[1]

I.  **Background**

Eastern Financial Florida Credit Union ("Eastern") formerly operated as a Florida state-chartered credit union. See DE 1-2 (Compl.) at 35, ¶ 11. Between December 2005 and July 2007, Eastern invested over $100 million in twelve collateralized debt obligations ("CDOs") that were sold by five investment banks and their predecessors ("Bank Defendants") and were assigned credit ratings by two nationally recognized rating agencies ("Agency Defendants"). See id. at 35-38, ¶¶ 12-16, 19-20, 23; id. at 74 (Ex. A).[2] A CDO is a financial vehicle that sells notes to investors and uses the proceeds to buy assets—here, primarily, residential mortgage-backed securities. See id. at 32, ¶ 3. The notes entitle investors to payments generated by the CDO's assets. See id. at 38-39, ¶ 24. The notes issued by a CDO are not identical; they are

---

[1] Defendants have also filed a Request for Oral Argument on Their Motions to Dismiss [DE 91]. The Court finds that the dispositive issues raised in Defendants' Motions are fully addressed in the parties' written filings and therefore a hearing is unnecessary. Accordingly, Defendants' request for oral argument is denied.

[2] Eastern also invested in a thirteenth CDO, "Corona Borealis," sold by Lehman Brothers Holdings Inc. and its former principal, Defendant Richard S. Fuld, Jr. See DE 1-2 at 37, ¶ 17; id. at 74. Because Fuld has been voluntarily dismissed from this action, see DE 27, 28, the Corona Borealis CDO is no longer at issue here. Defendant Merrill Lynch Credit Corporation has likewise been voluntarily dismissed, see DE 51, 54, but the claims against Bank Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated remain pending.

2

divided into several tiers, or "tranches," that carry different levels of credit risk, yield, and payment priority.  See id.  When Eastern bought the CDO notes from the Bank Defendants, the Agency Defendants had assigned those notes investment-grade credit ratings of "AA" or "A," indicating a low risk of default.  See id. at 42, ¶ 34; id. at 44-45, ¶ 39; id. at 74.  The CDOs, however, "ultimately defaulted on principal and interest payments and are now worthless."  Id. at 64, ¶ 104.

In June 2009, Plaintiff Space Coast Credit Union ("Space Coast"), another Florida state-chartered credit union, acquired Eastern's assets and liabilities through an emergency merger approved by the State of Florida.  See DE 1-2 at 35, ¶ 11.  On February 6, 2012, Space Coast filed this action against the Bank Defendants and Agency Defendants (collectively, "Defendants") in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida.  See id. at 29-76.  Space Coast's Complaint "seeks to recover over $100 million in investment capital that [D]efendants' CDOs wrongfully took from [P]laintiff."  Id. at 32, ¶ 2.  Space Cost alleges that Defendants engaged in six types of "systematic fraud in selling CDOs to [P]laintiff":

(a) First, [D]efendants used knowingly inflated, inaccurate and unreliable credit ratings to sell the rated CDOs to [P]laintiff, and fraudulently omitted the fact that [Agency Defendant] S&P's CDO ratings were the result of secret, out-of-model adjustments that S&P made to inflate its *own* ratings because its *own* models produced ratings on CDOs that were *lower* than its favored investment banking clients wanted;

(b) Second, [D]efendants used knowingly inflated, inaccurate and unreliable credit ratings to sell the rated CDOs to [P]laintiff, and fraudulently omitted the fact that the rating agencies were rating CDOs on a "curve," such that CDOs had inflated ratings relative to similar corporate and government issued bonds;

(c) Third, [D]efendants used knowingly inflated, inaccurate and unreliable credit ratings to sell the rated CDOs to [P]laintiff, and fraudulently omitted the fact that the so-called "NRSRO" investment

3

> grade ratings assigned to CDOs were not even educated opinions but unreliable "guesses" based on unverified, inaccurate data;
>
> (d)   Fourth, [D]efendants fraudulently omitted the fact that they were mispricing CDO notes in the first quarter of 2007 in order to dump over-valued mortgage-related bonds off of their own balance sheets and onto investors, including [P]laintiff; . . .
>
> (e)   Fifth, [D]efendants fraudulently omitted the fact that secret "short sellers"—business people who wanted to make investments that would profit when CDOs failed—had warped CDOs' assets, and their prices, during 2006 and 2007, in essence creating CDOs *so that* they would fail[; and]
>
> (f)   Sixth, [D]efendants used knowingly inflated, inaccurate and unreliable ratings to sell the rated CDOs to [P]laintiff, and fraudulently omitted the fact that the "correlation" input used to make those CDOs and to rate the notes that [D]efendants sold to [P]laintiff was inaccurate when [D]efendants used that "correlation" input.  Among other reasons, one government study shows that this correlation input was inaccurate due to the fact that the NRSRO Agencies and the other [D]efendants were packing CDOs with the same securities over and over again.

Id. at 33-34, ¶ 5 (citations omitted).  Based on these allegations, Space Coast asserts that the CDOs in which Eastern invested "collapsed due directly and proximately to [D]efendants' fraud."  Id. at 65, ¶ 105.  Space Coast pleads claims against Defendants for securities fraud under the Florida Securities and Investor Protection Act ("FSIPA"), Fla. Stat. § 517.301; common-law fraud; negligent misrepresentation; unjust enrichment; and imposition of a constructive trust against the Bank Defendants.  See DE 1-2 at 65-71.

On March 8, 2012, Defendants removed Space Coast's action to this Court based on diversity jurisdiction.  See DE 1 (Notice of Removal); 28 U.S.C. § 1332(a)(1).  The Bank Defendants subsequently filed a Joint Motion to Dismiss, as well as separate dismissal motions for each Bank Defendant.  See DE 58-60, 63, 65, 69.  Both Agency Defendants also filed Motions to Dismiss.  See DE 57, 64.  Plaintiff responded to

Defendants' Motions, and Defendants replied.  See DE 75, 82-88, 90.  Further, the parties submitted various documents and caselaw in support of their arguments.  The Motions are now ripe for decision.

## II.     Discussion

### A.     Pleading Standards

A plaintiff's complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Federal Rule of Civil Procedure 8(a)(2) requires that the complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To withstand a motion to dismiss, the complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Thus, a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (alteration, citations & internal quotation marks omitted).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557 (alteration in original)).

In addition to the general pleading standards of Rule 8, Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This particularity requirement

"serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted); see United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1313 n.24 (11th Cir. 2002) ("When a plaintiff does not specifically plead the minimum elements of [a fraud] allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements."). A complaint satisfies Rule 9(b) if it sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, . . . (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, . . . (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." Ziemba, 256 F.3d at 1202 (internal quotation marks omitted). More, when a plaintiff claims fraud by several defendants, "the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient." W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc., 287 F. App'x 81, 86 (11th Cir. 2008) (per curiam) (citing Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1317 (11th Cir. 2007); Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1381 (11th Cir.1997)). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam); see Clausen, 290 F.3d at 1310 ("[T]his court has

6

endorsed the dismissal of pleadings for failing to meet Rule 9(b)'s standards." (collecting cases)).

Here, every claim asserted by Space Coast is subject to Rule 9(b)'s heightened pleading standards for fraud. All of the claims for relief—even those that do not require proof of fraudulent intent—are based on alleged fraudulent representations and omissions that Defendants made to induce Eastern into buying CDOs. See DE 1-2 at 65, ¶ 108 (FSIPA); id. at 66, ¶ 114 (common-law fraud); id. at 68, ¶ 129 (negligent misrepresentation); id. at 69, ¶ 138 (unjust enrichment); id. at 70, ¶ 146 (constructive trust). Therefore, Rule 9(b) and the policies supporting it require Space Coast to plead these claimed fraudulent acts with particularity. See Infante v. Bank of Am. Corp., 468 F. App'x 918, 919-20 (11th Cir. 2012) (per curiam) (applying Rule 9(b) to fraud claim); Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1278 (11th Cir. 2006) (holding that plaintiffs must plead non-fraud claims with particularity when those claims are based on defendants' alleged fraudulent conduct); City Nat'l Bank of Miami v. Gen. Coffee Corp. (In re Gen. Coffee Corp.), 828 F.2d 699, 703 (11th Cir. 1987) ("A constructive trust arises from a situation where one party has defrauded another."); Arnold v. McFall, 839 F. Supp. 2d 1281, 1286-89 (S.D. Fla. 2011) (applying Rule 9(b) to claims for securities fraud under FSIPA, negligent misrepresentation, and common-law fraud); United States ex rel. Citizens United to Reduce & Block Fed. Fraud, Inc. v. Metro. Med. Ctr., No. 89-0592-CIV, 1990 WL 10519617, at *3 (S.D. Fla. Jan. 11, 1990) (holding that unjust-enrichment claim based on "fraudulent taking of money . . . must satisfy Rule 9(b)").[3]

---

[3] Space Coast argues that the rigorous pleading standards of Rule 9(b) should be "relaxed" in this case because (1) the alleged fraud is complex and (2) the specific facts of the fraud are solely within Defendants' knowledge. See DE 75 at 38-39 (citing

7

B.    Analysis of Defendants' Motions

Although Defendants have raised several arguments in support of dismissal, the Court finds the first of these points dispositive:  Space Coast's Complaint must be dismissed because it does not plead Defendants' alleged fraud with particularity, nor does it state a plausible claim for relief.  The Court therefore declines to address the other issues raised by Defendants.  Indeed, because Space Coast has not identified any fraudulent statements or omissions that Defendants made regarding the specific CDOs purchased by Eastern, the Court cannot evaluate Defendants' other arguments that depend on those statements or omissions.  For example, the Court cannot determine whether Eastern could have reasonably relied on the misrepresentations or omissions, when Eastern had notice of the fraudulent acts for limitations purposes, or whether the alleged misconduct establishes personal jurisdiction and venue over the Agency Defendants.  The Court will address in turn each category of fraud alleged by Space Coast.

---

Hill v. Morehouse Med. Assocs., Inc., No. 02-14429, 2003 WL 22019936, at *3, *5 n.6 (11th Cir. Aug. 15, 2003) (per curiam)).  But even if these exceptions to Rule 9(b)'s normal requirements were otherwise available here, Space Coast cannot invoke the exceptions since it has provided no concrete factual basis for any of its claims of fraud. See infra Part II.B; Clausen, 290 F.3d at 1314 n.25 (rejecting plaintiff's argument that court should relax Rule 9(b) standards due to defendant's unique knowledge of fraud, because plaintiff's "conclusory statements are insufficient to justify relaxation"); id. (declining to apply complexity exception to Rule 9(b) since plaintiff had failed to "allege at least some examples of actual [fraud] to lay a complete foundation for the rest of his allegations").

Also, in deciding the present Motions, the Court assumes that Space Coast's claims are governed by the substantive law of Florida.  While the Agency Defendants contend that New York law applies, the Court need not resolve that issue at this time. Regardless of which state's substantive law controls, all of Space Coast's claims arise from alleged fraudulent conduct by Defendants and therefore must be pleaded with the detail required by Rule 9(b).

### 1.     Out-of-Model Adjustments to Ratings

Space Coast first claims that Standard & Poor's Rating Services ("S&P"), a division of Agency Defendant The McGraw-Hill Companies, Inc., "made two major, secret adjustments to its CDO ratings," both of which "made CDOs appear to be far stronger than they actually were, resulting in inaccurate, inflated credit ratings." DE 1-2 at 47, ¶ 46. This claim relies on a 2010 academic research paper analyzing 916 CDOs that were issued from January 1997 to March 2007 and were rated by an unnamed credit-rating agency—apparently S&P. See id. at 46-51, ¶¶ 43-63; DE 75-3 (John M. Griffin & Dragon Yongjun Tang, Did Subjectivity Play a Role in CDO Credit Ratings? (McCombs School of Business 2010)) ("S&P Paper").[4] In general, the S&P Paper found that (1) S&P rated significantly more CDO notes as AAA (the highest credit rating) than its objective rating models would have allowed; and (2) only a small percentage of the AAA-rated CDO notes met S&P's published level of default risk for AAA debt obligations. Space Coast further suggests that these discrepancies increased during the last few years of the period studied. According to Space Coast, the Bank Defendants knew of the ratings discrepancies and "fraudulently use[d]" them to "'massively' misprice" CDO notes, "including those purchased by [Eastern]." DE 1-2 at 51, ¶ 63; see id. at 46, ¶ 43.

Even accepting Space Coast's interpretation of the S&P Paper's findings, Space Coast has not sufficiently alleged that Defendants engaged in fraud with respect to the

---

[4] In resolving Defendants' Motions, the Court may consider the documents incorporated by reference into Space Coast's Complaint (even though they are not physically attached to the Complaint) and the documents attached to the Motions. See Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005). These documents are central to Space Coast's claims, and their authenticity has not been challenged. See id.

9

particular CDOs at issue here.  There is no indication that any of the twelve CDOs in which Eastern invested—none of which were rated AAA—were part of the research study, much less that they were among the CDOs whose credit ratings were found to deviate from S&P's quantitative models.  In this regard, the Complaint states that less than half of the CDOs analyzed in the S&P Paper were composed of mortgage-backed securities like the CDOs Eastern owned.  See id. at 47-48, ¶ 49.  More, because Space Coast alleges that "S&P's out-of-model upgrades for new CDO ratings inexplicably stopped on April 1, 2007," id. at 50, ¶ 58, this theory of fraud would not apply to the four CDOs that Space Coast purchased after that date.  See id. at 74.  For these reasons, Space Coast has failed to plead in detail how each Defendant defrauded Eastern through use of S&P's ratings adjustments.  See Ziemba, 256 F.3d at 1202; W. Coast Roofing & Waterproofing, 287 F. App'x at 86.  Nor do Space Coast's allegations even "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

### 2. Inflation of Ratings Relative to Other Asset Classes

Space Coast next contends that the Agency Defendants inflated the credit ratings of CDO notes relative to the ratings of comparable corporate and government bonds because CDO ratings generated higher revenues for the Agency Defendants.  See DE 1-2 at 51-52, ¶¶ 64-65.  This claim relies on findings in another academic research paper, Credit Ratings Across Asset Classes: A = A?, published in October 2011 ("Asset Class Paper").  See id. at 51-53, ¶¶ 64-68.  The Asset Class Paper, according to Space Coast, is "based primarily on [Agency Defendant] Moody's data" and shows that "CDOs and other structured products 'have been rated more generously' than bonds issued by governments and corporations."  Id. at 52, ¶¶ 64-65.  Citing the paper's findings, Space Coast asserts that the Agency Defendants "[g]rad[e]

10

CDOs on a curve to make more money and please their *real* clients—Wall Street investment banks, including [Bank] [D]efendants." Id. at 53, ¶ 68.

Space Coast's allegations resting on the Asset Class Paper suffer from similar defects as the claims involving the S&P Paper. While the Asset Class Paper generally considered the ratings of "CDOs and other structured products," the study appears to provide no information about whether the specific CDOs in which Eastern invested were rated higher than comparable bonds. Space Coast's Complaint does not disclose what kinds of CDOs were involved in the study, what assets those CDOs held, what entities underwrote the CDOs, or when the underlying notes were issued. Again, Rule 9(b) requires Space Coast to plead each Defendant's alleged fraud in detail. See Ziemba, 256 F.3d at 1202; W. Coast Roofing & Waterproofing, 287 F. App'x at 86. This standard is not met by the generalized allegations here, which do not specify any Defendant's fraudulent acts or omissions toward Eastern. See also Twombly, 550 U.S. at 570 (holding that a complaint "must be dismissed" when a plaintiff has not "nudged [its] claims across the line from conceivable to plausible").

### 3. Failure of Ratings to Account for Defective Assets

The third type of fraud alleged by Space Coast is that

> the structures and ratings of the CDOs that [D]efendants sold to [Eastern] in this case were based on inaccurate and inadequate information that never captured the real characteristics of the CDOs' assets, as [D]efendants knew. Defendants fraudulently concealed the fact that the Investment Grade Ratings were little more than blind guesses based on pure speculation on false data.

DE 1-2 at 53, ¶ 69. This claim relies on (1) a 2008 working paper written by two university professors, The Economics of Structured Finance ("Finance Paper"); and (2) testimony and documents provided to the Financial Crisis Inquiry Commission

11

("FCIC") by executives of Clayton Holdings ("Clayton"), "the largest mortgage bond data-verification and due diligence processor in the world." Id. at 53-54, ¶¶ 70-73.

According to the Complaint, the authors of the Finance Paper found that most CDO notes could have been assigned high credit ratings only if the rating agencies were very confident in their estimates of the underlying securities' default risk. See id. at 53, ¶ 70. The Finance Paper further explained that even small errors in these estimates could have significantly altered the notes' ratings. See id. at 53-54, ¶ 70. Therefore, the authors concluded, using accurate and complete information about the underlying assets was essential in rating the notes correctly. See id.

In addition, Space Coast asserts that during the time period relevant to this case, the Bank Defendants and other investment banks hired Clayton to evaluate the residential loans underlying CDOs' mortgage-based assets, verify data from a sample of those loans, and prepare reports for the banks on those matters. See id. at 54, ¶¶ 71-72. The information that Clayton disclosed to the FCIC showed that, on average, the investment banks "waived in" thirty-nine percent of mortgage loans that failed to meet underwriting standards. Id. at 55-56, ¶ 76. Based on this information, Space Coast maintains that "defective loans" were included in the assets underlying the CDO notes that Eastern purchased from the Bank Defendants, thereby "render[ing] false [D]efendants' representations" about the credit quality of those notes. Id. at 56, ¶ 77.

Once again, Space Coast's claims relying on the Finance Paper and Clayton disclosures do not plead with the necessary detail that any of the Defendants committed fraud with respect to the CDO notes purchased by Eastern. The aggregate information provided by Clayton does not identify any specific CDOs that contained the defective loans or what percentage of the CDOs' assets were based on such loans.

12

See Landesbank Baden–Württemberg v. Goldman, Sachs & Co., 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011) (holding that fraud claim against issuer of mortgage-based CDO did not satisfy Rule 9(b), in part because complaint "fail[ed] to allege any connection between the mortgages reviewed in the Clayton Report and those collateralizing [the CDO]"), aff'd, 478 F. App'x 679 (2d Cir. 2012); see also Republic Bank & Trust Co. v. Bear Stearns & Co., 683 F.3d 239, 257 (6th Cir. 2012) (affirming dismissal of fraudulent-omission claim against seller of mortgage-backed securities because plaintiff did "not connect the [loan] underwriters' alleged failure to follow their underwriting standards to the loans and securities involved in this case").  And even assuming that some unknown number of those loans was included in the CDOs at issue here, Space Coast has alleged no specific facts indicating that the loans changed the CDO notes' overall credit ratings.  Though the Finance Paper stresses the importance of using accurate default-risk data in rating CDO notes, that general principle does not show that Defendants placed enough defective loans into the relevant CDOs to alter the credit ratings of the notes bought by Eastern.  Thus, Space Coast's allegations regarding defective loans are not "enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and they certainly do not meet the stringent pleading standards of Rule 9(b).

### 4. Mispricing of Assets

Space Coast further alleges, "on information and belief," that the Bank Defendants "used CDOs, particularly in 2007, to dump bad assets from their own balance sheets onto investors at inflated prices."  DE 1-2 at 60, ¶ 89.  To support this claim, Space Coast asserts that the SEC issued a cease-and-desist order against Wachovia Capital Markets LLC ("Wachovia Capital," predecessor to Defendant Wells

Fargo Securities LLC) relating to the "Longshore CDO," one of the CDOs in which Eastern invested.  See id.  According to Space Coast's Complaint, the SEC found that Wachovia Capital had avoided certain losses by transferring mortgage-backed securities worth about $250 million from the company's balance sheet to the Longshore CDO at a price that was $4.6 million above the assets' market value.  See id.

This theory of fraud suffers from three basic problems.  First, Space Coast alleges that Wachovia Capital overstated, by less than two percent, the value of certain mortgage assets that it owned when it transferred those assets to the Longshore CDO.  But Space Coast does not explain how this **$4.6 million** overstatement could have affected the offering price or credit rating of the Longshore CDO notes, which had a total value of **$1.3 billion**.  See DE 63-1 at 2-3 (Offering Circular).  Second, Space Coast speculates that the Longshore CDO misstatement "cannot be a trick that was unique to Wachovia Capital," and therefore claims that "the other Investment Bank Defendants engaged in the same mispricing scam."  DE 1-2 at 60, ¶ 90.  Space Coast, however, offers no facts to show that any other Defendants "dump[ed] bad assets from their own balance sheets onto investors at inflated prices."  Id. at 60, ¶ 89; see Iqbal, 556 U.S. at 678 (explaining that a complaint cannot state a claim by making "'naked assertion[s]' devoid of 'further factual enhancement'" (quoting Twombly, 550 U.S. at 557 (alteration in original))).[5]  Third, Space Coast's "mispricing" claim focuses on CDO

---

[5]  Space Coast contends that "in advance of discovery, it is impossible to know the extent to which this scam affected the Rated CDO Notes [bought by Eastern] because none of [those] Notes nor any of their constituent assets are publicly traded.  Only the Investment Bank Defendants have this information."  DE 1-2 at 60, ¶ 90.  But without alleging at least some non-speculative basis for its claim, Space Coast may not avoid the applicable pleading requirements merely by suggesting that discovery might reveal actionable fraud.  See Clausen, 290 F.3d at 1313 n.24; see also United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1359 (11th Cir. 2006) ("The

14

notes sold "in the first quarter of 2007." DE 1-2 at 33, ¶ 5(d). Yet nine of the twelve notes bought by Eastern—including Wachovia Capital's Longshore CDO—were issued outside that period. See id. at 74. For these reasons, Space Coast's mispricing allegations do not state a plausible claim for relief, nor do they plead fraud with the required particularity.

### 5. Selection of Assets by Short Sellers

Space Coast also alleges that the Bank Defendants "failed to disclose to [Eastern] that for many of the Rated CDO Notes, the assets were selected by hedge funds and others that put in a small amount of equity to launch the CDOs while simultaneously 'shorting' (*i.e.*, betting against) the CDOs and their collateral assets, and who would benefit in a huge way when the CDOs failed." DE 1-2 at 61, ¶ 92. Space Coast bases this claim on an alleged scheme in which various investment banks (including the Bank Defendants) and a hedge fund called "Magnetar" brought over $40 billion in CDOs to market in 2006 and 2007. See id. at 61, ¶ 93; id. at 76 (Ex. B) (listing Magnetar CDOs). See generally Intesa Sanpaolo, S.p.A. v. Credit Agricole Corporate & Inv. Bank, — F. Supp. 2d —, 2013 WL 525000, at *2 (S.D.N.Y. Feb. 13, 2013) (describing operation of "Magnetar Scheme"). Eastern invested in one of those CDOs, "Corona Borealis," which former Defendant Richard S. Fuld, Jr., helped underwrite. See DE 1-2 at 61-62, ¶ 94; id. at 74, 76.

Although some of the Bank Defendants issued CDOs allegedly involved in the Magnetar Scheme, Eastern did not own an interest in any of those CDOs. Cf. Intesa Sanpaolo, 2013 WL 525000, at *3-*4 (discussing claims brought by plaintiff that

---

particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." (internal quotation marks omitted)).

invested in "one of the CDOs that Magnetar used as a vehicle to perpetrate the Magnetar Scheme").  Further, because Fuld has been voluntary dismissed from this action, Space Coast may not assert a claim based on the Corona Borealis CDO.  And Space Coast offers no facts to support its assertion that short sellers helped issue the other CDOs owned by Eastern.  These allegations therefore fail to state a claim for relief under Rules 8 and 9(b).

### 6. Use of Faulty Correlation Data

Last, Space Coast avers that Defendants knew the CDO notes sold to Eastern carried false credit ratings because the "correlation" data used to create the notes was inaccurate.  DE 1-2 at 62, ¶ 97.  As explained in the Complaint,

> Correlation is similar to "diversification" in concept.  It measures how similar or interrelated a group of securities are to one another and to a particular industry.  This idea is important to the construction of a CDO because if its assets have low correlation (or are highly diverse) then it is very unlikely that they will all experience a negative credit event.

Id. at 62-63, ¶ 97.  Space Coast maintains that the correlation data for its CDOs was wrong because "the same [residential mortgage-backed] securities showed up over and over again in many CDOs."  Id. at 63, ¶ 98.

Space Coast supports this claim with a study published by the Federal Reserve Bank in August 2011, Collateral Damage: Sizing and Assessing the Subprime CDO Crisis ("Federal Reserve Study").  See id.  According to Space Coast, the Federal Reserve Study found that CDOs purchased many more residential mortgage-backed securities than investment banks issued.  See id. at 63, ¶ 99.  The study further indicated that this "cross referencing" increased the correlation of the CDOs' assets. Id. at 63, ¶ 100.  Relying on the Federal Reserve Study's alleged findings concerning

16

"[D]efendants' conduct during the relevant time," Space Coast claims that "[t]his conduct directly impacted the CDOs at issue in this case, and rendered their investment grade ratings wildly inaccurate, as all [D]efendants knew." Id. at 64, ¶ 102.

As with other theories discussed above, Space Coast's claim regarding correlation of CDOs' securities relies on general information about the CDO market as a whole and not the specific CDOs owned by Eastern. The Federal Reserve Study, as described in the Complaint, examined mortgage-based CDOs collectively and made no findings concerning any particular CDOs or their issuing banks. Space Coast yet again gives no factual support for its claim that the cross-referencing of mortgage securities in the broader CDO market affected Eastern's CDO notes and their credit ratings. Thus, Space Coast has not plausibly or specifically pleaded that any Defendant engaged in fraud against Eastern. In sum, because none of the fraud allegations in Space Coast's Complaint meet the pleading requirements of Rules 8 and 9(b), the Court will grant Defendants' Motions to Dismiss.

### C.     Dismissal Without Prejudice

In the event of dismissal, Space Coast requests "leave to amend the Complaint to correct any deficiencies." DE 75 at 108. While the pleading defects in the Complaint are substantial, Space Coast may be able to cure these problems by alleging in detail, and with a plausible factual basis, the fraud that each Defendant committed in connection with the CDOs owned by Eastern. The Court will therefore allow Space Coast to file an Amended Complaint that remedies these shortcomings.[6] See Ziemba,

---

[6] In response to Defendants' Motions, Space Coast concedes that its FSIPA claim is barred by a five-year statute of repose to the extent that claim is based on CDO notes purchased before February 6, 2007. See DE 75 at 67 n.42; Fla. Stat. § 95.11(4)(e). Thus, any Amended Complaint filed by Space Coast should limit the

256 F.3d at 1202 ("Where it appears a more carefully drafted complaint might state a claim upon which relief can be granted, a district court should give a plaintiff an opportunity to amend his complaint instead of dismissing it." (alterations & internal quotation marks omitted)); see also Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.").  Accordingly, the current Complaint will be dismissed without prejudice.

### III.    Conclusion

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Securities LLC (f/k/a Wachovia Capital Markets LLC), J.P. Morgan Securities Inc. (f/k/a Bear Stearns & Co., Inc.), UBS Securities LLC, and Barclays Capital Inc.'s Joint Motion to Dismiss [DE 58]; Corrected Motion to Dismiss Claims Against Merrill Lynch, Pierce, Fenner & Smith Incorporated [DE 69]; Defendant Wells Fargo Securities LLC's Motion to Dismiss [DE 63]; Defendant J.P. Morgan Securities, LLC's Supplemental Motion to Dismiss [DE 65]; UBS Securities LLC's Motion to Dismiss Plaintiff's Complaint Pursuant to Rules 12(b)(6) and 9(b) [DE 60]; Defendant Barclays Capital Inc.'s Supplemental Memorandum of Law in Support of Its Motion to Dismiss [DE 59]; Defendant Moody's Investors Service, Inc.'s Motion to Dismiss [DE 64]; and Defendant The McGraw-Hill Companies, Inc.'s Motion to Dismiss the Complaint [DE 57] are **GRANTED**;

2. Defendants' Request for Oral Argument on Their Motions to Dismiss [DE 91] is **DENIED**;

---

FSIPA claim accordingly.  The Court expresses no opinion about the remaining points raised in Defendants' Motions.  Defendants are free to renew those arguments, if appropriate, in response to any Amended Complaint.

3. Plaintiff's Complaint [DE 1-2] is **DISMISSED without prejudice**;

4. By no later than **April 17, 2013**, Plaintiff may file an Amended Complaint that addresses the pleading defects discussed herein;

5. If Plaintiff timely files an Amended Complaint, Defendants shall respond to the Amended Complaint by **May 17, 2013**;

6. If Plaintiff does not file an Amended Complaint by April 17, 2013, the Court will close this case;

7. Because this action is still in the pleadings stage, the Court's prior Order staying discovery [DE 95] shall remain in effect, and all other pretrial deadlines are hereby **STAYED** until the Court directs otherwise; and

8. In view of the Court's rulings above, Plaintiff's Motion to Stay Proceedings to Allow Leave to File an Amended Complaint [DE 99] is **DENIED as moot**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 18th day of March, 2013.

/s/ James I. Cohn
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF