UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60430-CIV-COHN/SELTZER

SPACE COAST CREDIT UNION,
as Successor-in-Interest to EASTERN
FINANCIAL FLORIDA CREDIT UNION,

    Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED; MERRILL
LYNCH CREDIT CORPORATION (d/b/a
MERRILL LYNCH HOME LOANS);
WELLS FARGO SECURITIES LLC
(f/k/a WACHOVIA CAPITAL MARKETS
LLC); J.P. MORGAN SECURITIES INC.
(f/k/a BEAR STEARNS & CO., INC.);
UBS SECURITIES LLC; BARCLAYS
CAPITAL INC.; RICHARD S. FULD, JR.;
MOODY'S INVESTORS SERVICE, INC.;
and THE MCGRAW HILL COMPANIES,
INC. (formerly d/b/a STANDARD &
POOR'S RATING SERVICES),

    Defendants.
_____/

## ORDER GRANTING MOTIONS TO DISMISS AMENDED COMPLAINT

**THIS CAUSE** is before the Court upon several dismissal motions filed by Defendants in response to Plaintiff's Amended Complaint [DE 103]: Defendant The McGraw-Hill Companies, Inc.'s Motion to Dismiss the Amended Complaint [DE 114]; Defendant Moody's Investors Service, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [DE 115]; UBS Securities LLC's Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Rules 12(b)(6) and 9(b) [DE 116]; Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities LLC, UBS Securities LLC,

and Barclays Capital Inc.'s Joint Motion to Dismiss the Amended Complaint [DE 117]; J.P. Morgan Securities LLC's Supplemental Motion to Dismiss Amended Complaint [DE 118]; Defendant Barclays Capital Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [DE 120]; and Merrill Lynch, Pierce, Fenner & Smith Incorporated's Motion to Dismiss Plaintiff's Amended Complaint [DE 121] (together, "Motions").[1]  The Court has carefully reviewed the Motions and all related filings and is otherwise fully advised in the premises.[2]

I.  **Background**[3]

Plaintiff Space Coast Credit Union ("Space Coast") brings this action as successor in interest to Eastern Financial Florida Credit Union ("Eastern"), which invested over $100 million in the notes of twelve collateralized debt obligations ("CDOs") between December 2005 and July 2007.[4]  These CDOs—which mainly owned

---

[1]  Also, in response to arguments raised by one Defendant concerning personal jurisdiction, Plaintiff has filed a Motion to Take Limited Jurisdictional Discovery from Moody's Investors Service, Inc. [DE 131].  Because Defendants' Motions will be granted on other grounds, however, the Court need not reach these personal-jurisdiction issues.  See infra Part II.B.  Plaintiff's Motion is therefore denied as moot.  The Court likewise denies as moot Defendant Moody's Investors Service, Inc.'s Amended Motion to Strike [DE 164], which concerns other filings by Plaintiff regarding personal jurisdiction.

[2]  Although some parties have asked to present oral arguments on the Motions, the Court finds that the dispositive issues raised in the Motions are fully addressed in the parties' written filings and that a hearing is unnecessary.  Thus, the requests for oral argument are denied.

[3]  The full background of this case is discussed in the Court's earlier Order Granting Defendants' Motions to Dismiss [DE 100], reported at 295 F.R.D. 540.  Here, the Court will summarize the facts and procedural events directly relevant to the pending Motions.

[4]  Eastern also invested in a thirteenth CDO, "Corona Borealis," which former Defendant Richard S. Fuld, Jr., allegedly helped underwrite.  In its prior dismissal Order, the Court stated that "[b]ecause Fuld has been voluntarily dismissed from this action, the Corona Borealis CDO is no longer at issue here."  DE 100 at 2 n.2 (citation omitted); see id. at 16 ("[B]ecause Fuld has been voluntary dismissed from this action,

residential mortgage-backed securities ("RMBSs")—were assigned credit ratings by two nationally recognized rating agencies (the "Agency Defendants"). Eight of the CDOs were sold by four investment banks or their predecessors (the "Bank Defendants").[5] When Eastern bought the CDO notes from the Bank Defendants, the Agency Defendants had assigned the notes investment-grade credit ratings that indicated a low risk of default. But the CDOs later defaulted on principal and interest payments, and the notes are now essentially worthless.

In its original Complaint, Space Coast pleaded several fraud-based claims against Defendants, alleging that they engaged in six kinds of "systematic fraud in selling CDOs to plaintiff":

(a) First, defendants used knowingly inflated, inaccurate and unreliable credit ratings to sell the rated CDOs to plaintiff, and fraudulently omitted the fact that [Agency Defendant] S&P's CDO ratings were the result of secret, out-of-model adjustments that S&P made to inflate its *own* ratings because its *own* models produced ratings on CDOs that were *lower* than its favored investment banking clients wanted;

(b) Second, defendants used knowingly inflated, inaccurate and unreliable credit ratings to sell the rated CDOs to plaintiff, and fraudulently omitted the fact that the rating agencies were rating CDOs on a "curve," such that CDOs had inflated ratings relative to similar corporate and government issued bonds;

---

Space Coast may not assert a claim based on the Corona Borealis CDO."). Space Coast argues, though, that Corona Borealis is still part of this case since Defendants The McGraw-Hill Companies, Inc., and Moody's Investors Service, Inc., issued credit ratings for that CDO. See DE 127 at 40 n.11. But even accepting this contention, Space Coast has once again failed to adequately plead that Defendants engaged in fraud with respect to any of the CDO notes purchased by Eastern. See infra Part II.B.

[5] While Space Coast's first Complaint pleaded claims against another Bank Defendant—Wells Fargo Securities LLC, f/k/a Wachovia Capital Markets LLC ("Wells Fargo")—the Amended Complaint no longer names Wells Fargo as a Defendant. Accordingly, Wells Fargo will be dismissed from this action along with the other remaining Defendants.

(c) Third, defendants used knowingly inflated, inaccurate and unreliable credit ratings to sell the rated CDOs to plaintiff, and fraudulently omitted the fact that the so-called "NRSRO" investment grade ratings assigned to CDOs were not even educated opinions but unreliable "guesses" based on unverified, inaccurate data;

(d) Fourth, defendants fraudulently omitted the fact that they were mispricing CDO notes in the first quarter of 2007 in order to dump over-valued mortgage-related bonds off of their own balance sheets and onto investors, including plaintiff; . . .

(e) Fifth, defendants fraudulently omitted the fact that secret "short sellers"—business people who wanted to make investments that would profit when CDOs failed—had warped CDOs' assets, and their prices, during 2006 and 2007, in essence creating CDOs *so that* they would fail[; and]

(f) Sixth, defendants used knowingly inflated, inaccurate and unreliable ratings to sell the rated CDOs to plaintiff, and fraudulently omitted the fact that the "correlation" input used to make those CDOs and to rate the notes that defendants sold to plaintiff was inaccurate when defendants used that "correlation" input. Among other reasons, one government study shows that this correlation input was inaccurate due to the fact that the NRSRO Agencies and the other defendants were packing CDOs with the same securities over and over again.

DE 1-2 at 33-34, ¶ 5 (citations omitted). Based on these allegations, Space Coast asserted that the CDOs in which Eastern invested "collapsed due directly and proximately to defendants' fraud." Id. at 65, ¶ 105.

Defendants then filed several motions to dismiss, which the Court granted. See DE 100 (Order Granting Defs.' Mots. to Dismiss) ("First Dismissal Order"). The Court held that "Space Coast's Complaint must be dismissed because it does not plead Defendants' alleged fraud with particularity, nor does it state a plausible claim for relief." Id. at 8; see Fed. R. Civ. P. 8(a)(2), 9(b). Addressing each of the six theories above, the Court found that Space Coast had not pleaded sufficient facts to show that Defendants engaged in fraud with regard to the specific CDO notes bought by Eastern.

4

See DE 100 at 9-17.  The Court, however, granted Space Coast's request for "leave to amend the Complaint to correct any deficiencies."  Id. at 17.  "While the pleading defects in the Complaint are substantial," the Court explained, "Space Coast may be able to cure these problems by alleging in detail, and with a plausible factual basis, the fraud that each Defendant committed in connection with the CDOs owned by Eastern."  Id.  The Court therefore dismissed the Complaint without prejudice and allowed Space Coast to file an Amended Complaint that "remedies these shortcomings."  Id. at 17-18.

Space Coast later filed an Amended Complaint totaling 153 pages—over three times the length of its first Complaint—along with 51 pages of exhibits containing additional allegations.  See DE 103.  The Amended Complaint pleads claims for fraud, negligent misrepresentation, unjust enrichment, constructive trust (against the Bank Defendants only), and aiding and abetting fraud.  See id. at 143-51.  Compared to the original Complaint, the facts alleged in the Amended Complaint focus even more on the Agency Defendants' issuance of false credit ratings for CDOs and, in particular, those Defendants' use of flawed analytical models to determine the ratings.  Space Coast further contends that the Bank Defendants placed high-risk mortgage assets into CDOs while misrepresenting the nature of those assets to investors.  Many of Space Coast's newly pleaded facts are taken from allegations in other cases, including an enforcement action brought by the federal government against one of the Agency Defendants here.  See United States v. McGraw-Hill Cos., Inc., Case No. 2:13-cv- 00779-DOC-JCG (C.D. Cal. filed Feb. 4, 2013).

In response to the Amended Complaint, Defendants filed their present Motions seeking dismissal of this action with prejudice.  Space Coast responded to the Motions, see DE 127, and Defendants replied.  See DE 142–148.  The parties also submitted

5

various documents and caselaw in support of their arguments.  The Motions are now ripe for decision.

## II.  Discussion

### A.  Applicable Pleading Standards

A plaintiff's complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Federal Rule of Civil Procedure 8(a)(2) requires that the complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To withstand a motion to dismiss, the complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Thus, a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  For a claim to be facially plausible, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  If the complaint instead "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).  And when a plaintiff has not "nudged [its] claims across the line from conceivable to plausible," the complaint "must be dismissed."  Twombly, 550 U.S. at 570.

In addition to the general pleading standards of Rule 8(a)(2), Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This particularity requirement "serves an important purpose in fraud actions by alerting defendants to the precise

6

misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted); see United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1313 n.24 (11th Cir. 2002) ("When a plaintiff does not specifically plead the minimum elements of [a fraud] allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements."). A complaint satisfies Rule 9(b) if it sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, . . . (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, . . . (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." Ziemba, 256 F.3d at 1202 (internal quotation marks omitted). More, when a plaintiff claims fraud by several defendants, "the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient." W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc., 287 F. App'x 81, 86 (11th Cir. 2008) (per curiam) (citing Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1317 (11th Cir. 2007); Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1381 (11th Cir. 1997)). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam); see Clausen, 290 F.3d at 1310 ("[T]his court has endorsed the dismissal of pleadings for failing to meet Rule 9(b)'s standards.").

7

Like the prior Complaint in this case, every claim in Space Coast's Amended Complaint is subject to Rule 9(b)'s heightened pleading standards for fraud.  All of the claims for relief—even those that do not require proof of fraudulent intent—are based on alleged fraudulent representations and omissions that Defendants made to induce Eastern into buying the CDOs at issue.  See DE 103 at 145-46 (common-law fraud); id. at 147-48 (negligent misrepresentation); id. at 148-49 (unjust enrichment); id. at 150 (constructive trust); id. at 150-51 (aiding and abetting fraud).  Therefore, Rule 9(b) and the policies supporting it require Space Coast to plead these claimed fraudulent acts with particularity.  See Infante v. Bank of Am. Corp., 468 F. App'x 918, 919-20 (11th Cir. 2012) (per curiam) (applying Rule 9(b) to fraud claim); Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1064-65 (11th Cir. 2007) (affirming dismissal of aiding-and-abetting-fraud claim because it "fail[ed] to conform to the requirements of Rule 9(b)"); Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1278 (11th Cir. 2006) (holding that plaintiffs must plead non-fraud claims with particularity when those claims are based on defendants' alleged fraudulent conduct); City Nat'l Bank of Miami v. Gen. Coffee Corp. (In re Gen. Coffee Corp.), 828 F.2d 699, 703 (11th Cir. 1987) ("A constructive trust arises from a situation where one party has defrauded another."); Arnold v. McFall, 839 F. Supp. 2d 1281, 1288-89 (S.D. Fla. 2011) (applying Rule 9(b) to claims for negligent misrepresentation and fraud); United States ex rel. Citizens United to Reduce & Block Fed. Fraud, Inc. v. Metro. Med. Ctr., No. 89-0592-CIV, 1990 WL 10519617, at *3 (S.D. Fla. Jan. 11, 1990) (holding that unjust-enrichment claim based on "fraudulent taking of money . . . must satisfy Rule 9(b)").[6]

---

[6] In deciding the present Motions, the Court assumes that Space Coast's claims are governed by the substantive law of Florida.  While the Agency Defendants contend that New York law applies, the Court need not resolve that issue here.  Regardless of

### B. Analysis of Defendants' Motions

As described above in Part I, the Court dismissed Space Coast's first Complaint because it failed to allege plausibly and with particularity that Defendants committed any fraud regarding the specific CDO notes bought by Eastern. Seeking to remedy this problem, Space Coast's Amended Complaint tries to connect alleged fraudulent conduct by Defendants in the general CDO and RMBS markets to the CDO notes Eastern purchased. Defendants maintain, however, that this approach presents the same basic flaws as the earlier Complaint. The Court agrees with Defendants.[7]

#### 1. Claims Against Agency Defendants

Space Coast alleges that both Agency Defendants employed standardized computer models to assign credit ratings to CDOs. See DE 103 at 20-29. According to Space Coast, the Agency Defendants used these models despite knowing that two key inputs—the Agency Defendants' separate, model-based ratings of the underlying RMBSs, and the correlation assumptions for those RMBSs—were inaccurate.[8] See id.

---

which state's law controls, all of the claims arise from alleged fraudulent conduct by Defendants and therefore must be pleaded with the detail required by Rule 9(b).

[7] Like their earlier motions to dismiss, Defendants' current Motions advance several arguments in support of dismissal. But because the first of these points is dispositive, the Court again declines to address the other issues raised by Defendants. See DE 100 at 8.

[8] The Amended Complaint explains that correlation

> is similar to diversification in that it measures the relationships between different assets. Assets that have perfect, or 100%, correlation are essentially identical assets. On the other end of the spectrum, assets that have 0% correlation are completely dissimilar. If one asset in a group of perfectly or closely correlated assets fails, then all assets in the same group will likely fail. Conversely, where assets are sufficiently dissimilar in nature, if one fails then it is highly unlikely that any other assets in the group will fail.

DE 103 at 25, ¶ 50.

In particular, Space Coast asserts that the Agency Defendants' ratings of the CDO notes bought by Eastern were "false" and "the product of a fraudulent scheme" that "generated biased, inaccurate ratings that were not based upon current and adequate data." Id. at 29, ¶ 66. Over the next 70 pages of the Amended Complaint, Space Coast pleads a detailed chronology—spanning from 2003 to 2007 and beyond—of various statements made by and about the Agency Defendants concerning (1) the accuracy of their ratings models for CDOs and RMBSs and (2) how weakening the standards used in those models would boost the firms' competitive positions and earnings from investment-bank clients. See id. at 29-99. The quoted statements are derived from employees' internal e-mail messages, company documents, and testimony in government investigations and other lawsuits, as well as from reports and comments by government officials. See id. Sprinkled throughout Space Coast's timeline are repeated, formulaic allegations about Eastern's various purchases of CDO notes, the Agency Defendants' credit ratings of those notes, the fees the companies earned from the ratings, and the later ratings downgrades. See, e.g., id. at 42-50 (Broderick I CDO); id. at 50-52 (Ixis CDO); id. at 55-58 (Citius I CDO); id. at 60-63 (Ipswich CDO).

These allegations suffer from the same fundamental defects that undermined the first Complaint. While the Amended Complaint talks at length about the Agency Defendants' use of flawed RMBS ratings and correlation assumptions for CDOs **in general**, Space Coast offers no facts to support its conclusory assertions that these issues materially affected **Eastern's CDO notes**. Space Coast avers that the ratings models were widely used, but it provides no facts about the ratings of the RMBSs backing Eastern's CDO investments. And though Space Coast estimates the correlation figures assumed for those RMBSs, see DE 103 at 25, ¶¶ 51-52, it neither

10

identifies the source of the estimates nor explains how they were wrong.  More, despite claiming that the Agency Defendants' computer models "were the most important aspects" in rating CDOs, Space Coast acknowledges that "[t]here were other aspects" to the ratings process.  Id. at 25, ¶ 49; see also DE 144 at 13 (Def. Moody's Investors Service, Inc.'s Reply Br.) ("Even assuming that [Moody's computer model] was used in rating the CDOs at issue in this action—a contention for which Plaintiff fails to offer even rudimentary support—nothing in Plaintiff's pleading suggests that the ratings at issue were solely the result of a mechanical and uniform use of the model.").  Nor do any of the Agency Defendants' statements cited throughout Space Coast's chronology refer to the CDOs in which Eastern invested.  The facts that Space Coast interjects about Eastern's CDO purchases merely repeat those general statements without connecting them to the claimed fraud against Eastern.  In sum, Space Coast's superficial allegations about the Agency Defendants' conduct in the broader CDO and RMBS markets do not come close to stating plausibly and with particularity any claim that those Defendants defrauded Eastern.

### 2. Claims Against Bank Defendants

Space Coast alleges that the Bank Defendants knowingly contributed to the Agency Defendants' flawed ratings models by "waiving defective loans into RMBS securitizations."  DE 103 at 103, ¶ 311.  This contention is based on residential-loan data that the Bank Defendants received from Clayton Holdings, "the largest mortgage bond data-verification and due diligence processor in the world."  Id. at 104, ¶ 312.  But the allegations supporting this claim are copied nearly verbatim from Space Coast's original Complaint.  Compare DE 1-2 at 54-59, with DE 103 at 104-09.  And the Court held that these alleged facts were too general to support Space Coast's fraud claims:

11

> Once again, Space Coast's claims relying on the . . . Clayton disclosures do not plead with the necessary detail that any of the Defendants committed fraud with respect to the CDO notes purchased by Eastern.  The aggregate information provided by Clayton does not identify any specific CDOs that contained the defective loans or what percentage of the CDOs' assets were based on such loans.  See Landesbank Baden–Württemberg v. Goldman, Sachs & Co., 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011) (holding that fraud claim against issuer of mortgage-based CDO did not satisfy Rule 9(b), in part because complaint "fail[ed] to allege any connection between the mortgages reviewed in the Clayton Report and those collateralizing [the CDO]"), aff'd, 478 F. App'x 679 (2d Cir. 2012); see also Republic Bank & Trust Co. v. Bear Stearns & Co., 683 F.3d 239, 257 (6th Cir. 2012) (affirming dismissal of fraudulent-omission claim against seller of mortgage-backed securities because plaintiff did "not connect the [loan] underwriters' alleged failure to follow their underwriting standards to the loans and securities involved in this case").  And even assuming that some unknown number of those loans was included in the CDOs at issue here, Space Coast has alleged no specific facts indicating that the loans changed the CDO notes' overall credit ratings.

DE 100 at 12-13.  Given the substantially identical facts pleaded in the Amended Complaint, the Court again finds that "Space Coast's allegations regarding defective loans are not 'enough to raise a right to relief above the speculative level,' Twombly, 550 U.S. at 555, and they certainly do not meet the stringent pleading standards of Rule 9(b)."  DE 100 at 13.

Space Coast further claims that the Bank Defendants falsely represented to Eastern that the CDO notes it purchased were "protected by a comfortable amount of 'subordination.'"  DE 103 at 110, ¶ 330.  Subordination generally refers to surplus collateral assets incorporated into each level, or "tranche," of notes within a CDO to protect the noteholders' investments if some assets fail.  See id. at 111, ¶¶ 331-32.  Here, Space Coast maintains that the Bank Defendants placed many defective mortgage loans into the RMBSs underlying Eastern's CDO notes.  As a result, Space Coast contends, the RMBSs actually provided a deficit of subordination, meaning that the CDO notes were "effectively 'underwater.'"  Id. at 112, ¶¶ 333-35.

In support of this claim, Space Coast alleges that it conducted "empirical analyses focused on four different credit characteristics of the loans supporting RMBS[s] that each Bank Defendant included as collateral assets in their own CDOs" that they sold to Eastern.  DE 103 at 113, ¶ 336; see id. at 114, ¶ 337.  These analyses purport to compare the stated subordination figures for the CDO notes—apparently derived from the Bank Defendants' offering and marketing documents—to the amount of "defective RMBSs" backing each note.  See id. at 115, ¶ 339.  To determine which RMBSs were "defective," Space Coast relies on a "loan-level, forensic analysis" of four factors that it claims are predictive of a mortgagor's default:  (1) the "loan-to-value" ratio of residential properties, defined as "a percentage of the outstanding debt on a property to the market value of the property"; (2) the "combined loan-to-value" ratio of properties with more than one lien; (3) the "owner occupancy rate," meaning "the percentage of properties within [a] pool [of mortgages] that are occupied by the borrowers themselves"; and (4) the "'income' of the borrower of a particular mortgage."  Id. at 116, ¶ 341; id. at 118, ¶ 346; id. at 121, ¶ 357; id. at 123, ¶ 362.

The Court concludes that Space Coast's allegations concerning subordination do not state a plausible and particularized claim for relief against the Bank Defendants. The Bank Defendants argue, and Space Coast does not dispute, that the eight CDOs Eastern bought from those Defendants "were backed by more than 900 RMBS[s] containing more than 4.6 million loans."  DE 117 at 22 (Joint Mot. to Dismiss).  Yet each of Space Coast's "loan-level" analyses considers only a fraction of these RMBSs and underlying mortgage loans:

- The loan-to-value analysis used "an aggregate sample size of over 300,000 loans backing over 100 RMBS notes."  DE 103 at 117, ¶ 343.

13

- The combined loan-to-value analysis considered "a sample of over 175,000 loans that collateralized more than 75 RMBS[s]." Id. at 120, ¶ 352.

- The analysis of the owner occupancy rate "focused on a sample of over 195,000 loans that backed 100 RMBS notes." Id. at 121, ¶ 359.

- And Space Coast's analysis of borrower income was based on "the bankruptcy filings of 36 particular borrowers." Id. at 123, ¶ 363.

Space Coast never reveals—either in its Amended Complaint or in its Response to Defendants' Motions (which specifically raise this issue)—how it selected the loans in the samples it used, whether the chosen loans and the RMBSs containing them were fairly representative of the assets backing Eastern's CDO notes, and what percentage of the sampled loans and RMBSs were tied to each of the eight CDOs. Space Coast also fails to explain how loans made to 36 now-bankrupt borrowers could demonstrate fraud by each of the Bank Defendants on the massive scale alleged here. These critical omissions prevent the Bank Defendants from responding to Space Coast's claims regarding subordination.[9] Therefore, Space Coast has again failed to plead sufficient facts to show that the Bank Defendants committed fraud against Eastern.[10]

---

[9] The Bank Defendants raise other valid concerns about the methods Space Coast uses in its loan analyses. For example, Defendants question Space Coast's assumption that if a property-tax bill is sent to an address other than the property itself, then the owner does not occupy the property. See DE 103 at 121-22, ¶ 359; DE 143 at 10 n.2 (Joint Reply Br.). Defendants also point out that the 36 borrowers' incomes reported in post-loan bankruptcy filings do not reliably show that those borrowers were unable to afford the loans when made. See DE 103 at 123-36; DE 117 at 24.

[10] The other allegations in Space Coast's Amended Complaint fare no better. Space Coast claims that investment banks, using their status as favored customers of the Agency Defendants, pressured those Defendants to "keep their standards low and continue issuing inflated CDO and RMBS ratings." DE 103 at 100, ¶ 299. But while the Amended Complaint pleads facts generally supporting this claim, Space Coast points to nothing that suggests that any such pressure from the Bank Defendants affected the credit ratings of the CDO notes purchased by Eastern here.

Likewise unavailing are the assertions by Space Coast that Defendant UBS Securities LLC conspired with the Agency Defendants to fraudulently sell the Kleros III

***

Like its previous Complaint, most of Space Coast's Amended Complaint "relies on general information about the CDO market as a whole and not the specific CDOs owned by Eastern." DE 100 at 17. Nor has Space Coast otherwise "plausibly or specifically pleaded that any Defendant engaged in fraud against Eastern." Id.; see Fed. R. Civ. P. 8(a)(2), 9(b). Accordingly, the Court will grant Defendants' Motions to Dismiss the Amended Complaint.

### C. Dismissal with Prejudice

At the end of its Response opposing the Motions, Space Coast alternatively seeks "leave to amend the [Amended Complaint] to correct any deficiencies." DE 127 at 159. But when, as here, a request for leave to amend "simply is imbedded within an opposition memorandum, the issue has not been raised properly," and the Court may deny that request without further discussion. Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009) (internal quotation marks omitted). Space Coast also has "failed to attach a copy of [its] proposed amendment or to describe the substance of [the] amendment." Id. (citing Fed. R. Civ. P. 7(b)). The First Dismissal Order detailed the problems with the original Complaint, and Defendants correctly argued in their Motions that the Amended Complaint presented the same essential defects. Yet Space Coast's

---

CDO to Eastern. See DE 103 at 137-43. These allegations merely show that a UBS employee who made statements relating to other CDOs and the CDO market in general was involved in selling Kleros III notes to Eastern and responded to an e-mail question from one of its employees. See id. at 141-42, ¶ 418.

    Further, the exhibits attached to the Amended Complaint allege that the Bank Defendants made fraudulent statements to Eastern in offering and marketing materials. See DE 103–1, 103–2. Similar to its claims against the Agency Defendants, though, Space Coast simply repeats the generalized allegations from the Amended Complaint without tying those assertions to the claimed fraud against Eastern.

15

one-sentence request for leave to amend says nothing about how a Second Amended Complaint would cure these deficiencies.

Further, the Court previously ordered Space Coast to correct the "substantial" pleading defects in its first Complaint by "alleging in detail, and with a plausible factual basis, the fraud that each Defendant committed in connection with the CDOs owned by Eastern." DE 100 at 17.  But while the Amended Complaint pleads many new facts, Space Coast still has not alleged a plausible, particularized basis for its claims that each Defendant defrauded Eastern.  Given this basic deficiency that Space Coast has been unable to remedy, allowing Space Coast to amend its Complaint further would inevitably lead to dismissal.  See Ziemba, 256 F.3d at 1213 ("Where it appears a more carefully drafted complaint might state a claim upon which relief can be granted, a district court should give a plaintiff an opportunity to amend his complaint instead of dismissing it.  However, if a more carefully drafted complaint could not state a claim, dismissal with prejudice is proper." (alterations, citation & internal quotation marks omitted)); see also Gonzalez v. City of Deerfield Beach, 549 F.3d 1331, 1336-37 (11th Cir. 2008) (affirming denial of leave to amend complaint because proposed amendments would have been futile); Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255-57 (11th Cir. 2008) (similar).  For the same reason, and in view of the substantial resources already expended in this case, granting leave to amend would not serve the interests of justice.  See Fed. R. Civ. P. 15(a)(2).  The Court will therefore dismiss this action with prejudice.

## III.   Conclusion

For the reasons discussed above, it is hereby **ORDERED AND ADJUDGED** as follows:

16

1. Defendant The McGraw-Hill Companies, Inc.'s Motion to Dismiss the Amended Complaint [DE 114]; Defendant Moody's Investors Service, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [DE 115]; UBS Securities LLC's Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Rules 12(b)(6) and 9(b) [DE 116]; Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities LLC, UBS Securities LLC, and Barclays Capital Inc.'s Joint Motion to Dismiss the Amended Complaint [DE 117]; J.P. Morgan Securities LLC's Supplemental Motion to Dismiss Amended Complaint [DE 118]; Defendant Barclays Capital Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [DE 120]; and Merrill Lynch, Pierce, Fenner & Smith Incorporated's Motion to Dismiss Plaintiff's Amended Complaint [DE 121] are **GRANTED**;

2. The Motion of Space Coast Credit Union to Take Limited Jurisdictional Discovery from Moody's Investors Service, Inc. [DE 131] and Defendant Moody's Investors Service, Inc.'s Amended Motion to Strike [DE 164] are **DENIED AS MOOT**;

3. The above-styled action is **DISMISSED WITH PREJUDICE** as to all remaining Defendants; and

4. The Court will enter a separate Final Judgment consistent with this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 25th day of March, 2014.

_____
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF